**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| **SHANON D. JOHNSON** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No:_____ |
| | ) | |
| **HBL, LLC** | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Shanon D. Johnson ("Plaintiff"), by and through counsel, brings this Complaint against Defendant HBL, LLC ("Defendant" and "HBL") on the grounds and in the amounts herein:

### Preliminary Statement

1.  Shanon D. Johnson was the victim of intentional fraud, deception, and violations of the Virginia Consumer Protection Act by serial acts of fraud perpetrated against him by HBL related to the sale of two successive Mercedes-Benz automobiles.  In January 2007, Mr. Johnson traveled from Maryland to Tysons Corner, Virginia to purchase a certified pre-owned 2004 S55 Mercedes-Benz automobile from HBL based upon his belief that HBL was a reputable and honest dealership. What he did not know was that HBL had adopted a fraud scheme that had been used by many small used car dealers for years and normally eschewed by the larger, more reputable dealers.  In order to convince unsuspecting consumers that there has been no paint work or damage to a used vehicle (when the dealer knew there had been such damage), car dealers obtain copies of Carfax reports for the vehicle that do not reflect any damage to the vehicle and provide them to the consumer as definitive proof that the vehicle has a clear history and has never suffered any collision damage.  The dealers, of course, know the condition of the vehicle based upon their superior

knowledge, expertise, and training.  HBL presented Mr. Johnson with a Carfax report and assured him that the S55 vehicle had never been damaged.  It was not until years later when he tried to trade the vehicle back into HBL, that HBL disclosed the damage and told him that the trade value had dropped considerably as a result.  This new information caused Mr. Johnson great concern about the reliability of HBL, and he was extremely hesitant to do business with it again, but they assured him that the people who defrauded him back in 2007 were no longer there and that is not the way HBL does business.  Mr. Johnson was very interested in purchasing a low mileage 2015 E63 AMG vehicle that HBL was offering for sale for more than $70,000, but was hesitant because of the prior fraud and asked many questions about the E63.  Once again HBL presented him with a clean Carfax report and assured him that they had fully examined the vehicle and that there was no damage to this vehicle.  After about a month of dealing with HBL and it providing him absolute assurances of the present condition of the vehicle as a fully inspected, certified pre-owned Mercedes with no collision damage or paint work, he agreed to purchase the E63.  After he took delivery, he learned that the vehicle would not pass a Maryland state inspection because three of the tires failed inspection and shortly thereafter, he discovered that the driver's door and rear door on the driver's side had been damaged, poorly repaired, and repainted.  Upon further investigation, Mr. Johnson learned that the affiliated body shop right behind HBL (Tyson's Corner Collision Center) that is also owned by the Penske group (which owns HBL) is the entity that made the repairs to and painted the vehicle.  The depreciation to the vehicle due to the repair work dropped the value of the E63 by more than 25%.  Unable to resolve the two successive frauds with HBL, Mr. Johnson filed a demand in arbitration against HBL with the AAA as required in the contract, only to learn that HBL had been notified by the AAA to remove the AAA from its arbitration provisions in its contracts because it failed to follow their rules and failed to pay the required fees.

Based upon the AAA rules, once a business has been delisted from the AAA, the consumer can file an action in court. Accordingly, Mr. Johnson brings this action against HBL for its actual fraud and violations of the Virginia Consumer Protection Act and demands actual damages, punitive damages, attorney's fees and costs for its willful violations of the VCPA and actual fraud.

## Parties

2.  Plaintiff Shanon D. Johnson is a natural person and resident of the state of Maryland.

3.  Defendant HBL, LLC d/b/a as Mercedes-Benz of Tysons is a Delaware corporation with a principal place of business in Delaware that regularly transacts business in Tysons Corner Virginia. HBL is a supplier as that term is defined by the VCPA in that it sells goods and services in Virginia and otherwise engages in consumer transactions as identified in the VCPA.

## Jurisdiction & Venue

4.  This court has jurisdiction pursuant to 28 U.S.C §1332 in that the parties are diverse in that the Plaintiff is a resident of Maryland and Defendant is a resident of Delaware in that it was incorporated in Delaware and has a principal place of business in Delaware. The matter in controversy, exclusive of interest and costs, exceeds $75,000. Venue is proper in this jurisdiction in that the sale of both vehicles occurred in the Alexandria Division of the Eastern District of Virginia, HBL operates a dealership in this jurisdiction, and it is the forum most convenient for the parties.

## Factual Allegations

5.  On or about January 11, 2007 Shanon Johnson went to the HBL dealership located at 8545 Leesburg Pike, Vienna, Virginia 22182 to purchase a used Mercedes-Benz vehicle. Mr. Johnson traveled from his home state of Maryland to Virginia to visit HBL because he believed that it was an honest and reputable new and used Mercedes-Benz dealership. Mr. Johnson wanted to purchase

a 2004 S55 Mercedes-Benz for approximately $65,000 that HBL had advertised for sale.  As part of the transaction, Mr. Johnson asked the dealership, acting through its sales person and manager, about the condition of the vehicle.  HBL assured him that the vehicle had been certified as a pre-owned Mercedes-Benz which meant that it had passed its rigorous inspections and exacting standards.  In addition, the sales person and sales manager assured him that it had no collision damage or paint work.

6.  As part of its efforts to prove the pristine condition of the vehicle, HBL, acting through its salesperson and sales manager provided him with a copy of a Carfax report for the vehicle that did not report any collision damage or repair work and used that Carfax report to assure Mr. Johnson and prove to Mr. Johnson that the vehicle had not been previously damaged or repainted.  Mr. Johnson does not have all of his sales documentation and will need further discovery of the defendant's records to provide the exact name of the salesperson and manager that made the false statements to him as part of the transaction.

7.  HBL knew that the vehicle was not as it had represented to Mr. Johnson or free from all collision damage, repair work and paint work.  HBL knew the true condition of the vehicle because it is a sophisticated new and used Mercedes-Benz dealer that hires and retains on its staff individuals that can determine collision damage, repair work, paint-work, body panel replacements and other such issues that will impact the value of a high-end vehicle like a Mercedes-Benz.  The individuals that purchase used vehicles on behalf of dealerships like HBL are highly trained to detect such issues because they know how much repair work or paint work impacts a vehicle's value.  Even minor repair work and paint work can depreciate a high-end Mercedes by $10,000 and much more.  As a result, buyers of such cars must be extremely careful when examining and evaluating used vehicles.

8.   If a used car manager/ buyer is in a hurry (like at an auction) or wants a second opinion on suspected paint work, he/she can use a paint meter that instantly measures the paint depth on a portion of a vehicle.  In approximately a minute, a professional buyer with a paint meter can walk around the car and check all the body panels to determine if the vehicle has after-market paint applied.  Whether by personal observation or paint meter readings, dealers know what work has been done to a vehicle before they purchase it or put it on the lot for resale.

9.   HBL never disclosed the prior damage to Mr. Johnson in response to his direct questions, falsely represented that the vehicle had not been damaged, and repaired and financed that vehicle for seven years, with over $31,000 in interest added to the purchase price of the vehicle.  Because of the high cost of interest, consumers that are defrauded on their purchases like Mr. Johnson suffer additional damages beyond the overpayment for the vehicle in the form of over payment on finance charges on the amount of the overpayment on the vehicle.

10. Mr. Johnson kept the S55 for the entire seven-year loan term (paying the loan in full) and for a few more years after that and then decided to return to HBL to trade it in and purchase another used Mercedes.  Mr. Johnson was totally unaware of the fraud on the S55 when he returned to HBL, but he was about to learn very quickly.

11. Mr. Johnson was anticipating a fair trade-in value of around $14,000 for his S55 Mercedes, but HBL limited its offer to $4,000 due to the fact that the vehicle had been in a collision, repaired and its value had decreased significantly because of that repair.  Mr. Johnson had never damaged the vehicle and was shocked to hear that and made clear that if the vehicle had been damaged, it had to have been damaged prior to his purchase from HBL.

12. By the time that Mr. Johnson was ready to trade the vehicle, Carfax had begun reporting that there had been collision damage reported in Ohio on June 21, 2004 to the vehicle.  The updated

Carfax report noted next to that entry: "CARFAX began reporting this information on 2/16/2013." Thus, in this particular case, it took almost nine years before Carfax started reporting that damage to the vehicle.

13. While all car dealers know and have known for decades that collision damage takes a while to catch up to a vehicle on a Carfax report and sometimes never does, using a Carfax report to "prove" to a consumer that there was no prior repair damage to a car was a tactic used primarily by the small, disreputable, no-name, used car dealers. While no car dealer would rely upon a Carfax report to determine if a vehicle had been damaged and repaired, they have no problem using inaccurate reports to convince consumers of that very thing. The fact that dealers like HBL have resorted to this sort of low-brow fraud is disturbing, but telling about what sort of dealership it has become.

14. Most consumers like Mr. Johnson are not aware of the issues or reliability problems with Carfax reports and believe that the reports that they are receiving from dealerships like HBL are accurate and reliable. The fact that they are going to high-end new and used car dealers like HBL gives them that added degree of confidence that what the dealer is saying is accurate and reliable. What Mr. Johnson did not know or suspect was that HBL was no better than the no-name used car dealers that populate many small highways and towns.

15. Mr. Johnson was extremely upset and disturbed that HBL had perpetrated that fraud upon him during the sale of the S55 and wanted fair market value for this trade because of it. HBL refused to increase its offer because the people that sold him that car were no longer there and they claimed that it could not be held responsible for their fraud. As a result, Mr. Johnson was unwilling to sell the S55 for such a low price and decided to retain it.

16. Being sales people and particularly used car sales people, HBL's employees including salesperson (Dwain Smith) and the sales manager (Mike Sarwar) assured Mr. Johnson that such fraud was not the way that HBL did business. They could not explain how that happened in the past, but could assure him that the present group of sales people would not act that way. They wanted to sell him a very expensive used E63 AMG vehicle and said what they had to say to convince him to trust them despite the prior fraud.

17. Mr. Johnson was still very interested in the low-mileage E63 AMG, but he wanted to be extra careful this time to make sure that he was not purchasing another damaged and highly devalued vehicle. Having been burned once, Mr. Johnson wanted even more assurances that this vehicle had no prior damage or repair work. Dwain Smith and the sales manager (Mike Sarwar) from HBL were more than happy to assure him this was a clean car, that it was certified and inspected by the certified pre-owned team, that there was no repair work, no paint work, and he would be fine with this car's prior history. Once again, the dealership provided him with a copy of a Carfax report that did not show any body damage and repair work to prove that this vehicle had no body or paint work done on it after it left the factory

18. Reluctantly and after almost a month of discussions, Mr. Johnson trusted HBL and relied upon the fact that this was a different group of employees and that they would not do the same thing to him a second time, particularly after he had made such an issue of how HBL had defrauded him on the sale of the S55.

19. On June 6, 2018, Mr. Johnson signed a Buyer's Order for the E63 AMG and paid more than $70,000 for a used vehicle that he had been assured was a top-quality used car that had been reconditioned to Mercedes-Benz exacting standards and certified as a Pre-Owned Mercedes-Benz.

20. The E63 AMG is notorious for wearing through tires in seven to eight thousand miles depending on how you drive.  HBL had been servicing this vehicle for the original owner/lessee since July 2016 and the first recorded repair according to Carfax was the replacement of the tires and brake pads at 7,085 miles.  In light of the fact that the second set of tires were driven by the same individual that ran through the first set in 7,000 miles, it would be unlikely that the second set would last any longer than the first, and the tires clearly did not.

21. HBL assured Mr. Johnson that the vehicle had been inspected and certified to Mercedes-Benz's exacting standards which requires that the tires be at least 5/32 of an inch of tread on all the tires. It also had the vehicle Virginia inspected and that inspection requires a minimum of 2/32 on all tires.

22. When he took the vehicle to be state inspected in Maryland on June 27, 2018 (three weeks after he purchased it) the vehicle failed because three of the tires had less than 2/32 of tread left. According to the Mercedes Benz website, any tires with less than 5/32 will not be certifiable and must be replaced.

23. Mr. Johnson promptly brought back the vehicle, and on June 29, 2018, HBL agreed to replace all the tires for no charge.  HBL not only did not charge Mr. Johnson for the replacement of the tires, but it failed to provide him with a repair order for the work in violation of the Motor Vehicle Repair Facilities Act (§59.1-207.5).

24. Based upon information and belief, HBL did not provide a repair order because it did not want to document that a few weeks after it had fully inspected and certified the vehicle under Mercedes-Benz exacting standards, that it was obligated to replace all four tires for free because the tire tread was dangerously low.

25. Mr. Johnson took the E63 vehicle in to be detailed in August 2018 and when he did, the detailer noticed that there was some paint overspray on the inside of the driver's rear door and the striker had been painted as well. This would certainly not be the way the vehicle would be delivered from the factory and demonstrated that there had been aftermarket paint applied.

26. Mr. Johnson took the vehicle to a body repair shop for inspection and was informed that both the driver's door and the rear door had been damaged and repainted. Further examination revealed that the depth of paint on the driver's side doors were more than six times (6x) the depth on the passenger side doors. Even further examination demonstrated that the work was sub-standard and that it would cost nearly $9,000 to re-do the work to do it correctly, or replace the door skins on both doors. Either way, the damage was so extensive that the value of the vehicle dropped by tens of thousands of dollars.

27. Armed with the evidence of extensive paintwork on both driver's side doors, Mr. Johnson confronted the General Manager, Jason Hoover, with the issue and told him how HBL had deceived him twice. Mr. Hoover wanted to examine the vehicle in more detail, so he asked Mr. Johnson to drop it off at the dealership and took a loaner vehicle while HBL inspected the claims.

28. When he left the vehicle with Mr. Hoover, Mr. Johnson pointed out to Mr. Hoover the paint overspray on the inside of the door that his detailer noticed and HBL had to have seen when it inspected the vehicle.

29. HBL retained the vehicle for a while and told Mr. Johnson that he could return to pick-up his vehicle. When Mr. Johnson returned to HBL to pick up his vehicle and see what HBL intended to do about it, he saw that the paint overspray had been removed. Mr. Johnson asked the service representative about that and the representative said that Mr. Hoover personally had instructed him to remove the overspray.

30. At no time did Mr. Johnson authorize HBL to do anything to the vehicle other than examine it, but HBL and Mr. Hoover were actively trying to cover-up the fraud and evidence. At first Mr. Hoover and the repair person said they had examined the vehicle and determined that the damage was not that bad and did not see why Mr. Johnson was so upset about the prior damage to the vehicle. Later, Mr. Hover stated that HBL did not know about the damage when it sold the vehicle to Mr. Johnson. Neither of those statements were true and both were intended to further defraud Mr. Johnson. Having lied to and defrauded Mr. Johnson twice HBL was trying to conceal its fraud.

31. It turns out that HBL had been servicing this vehicle since July 2016 and its affiliated paint shop around the corner from the dealership (Tyson's Corner Collision Center owned by the same entity: Penske) was the one that did the body repair and paint work to the vehicle. Thus, HBL not only knew about the repairs, but it was closely associated with the entity that repaired that very vehicle. Based upon information and belief, the lessee of the vehicle at the time of the damage was advised by HBL to take it to their repair facility.

32. The repairs to the vehicle were sub-standard and the cost to re-do the work would be approximately $9,000. Even after the work was corrected, the vehicle would be worth substantially less than a similar vehicle without the extensive body work.

33. Mr. Johnson took the vehicle to CarMax for an unbiased appraisal offer and received an offer of $47,000. He subsequently provided that appraisal to HBL as proof of the diminution of value to the vehicle. The "Conditions Assessed" portion of the CarMax offer stated: "Driver Front Door: Prior Paintwork" and "Driver Rear Door: Prior Paintwork."

34. At the time of the CarMax appraisal, the vehicle was six months older than when he purchased it and had 7,300 more miles on it, so some additional depreciation had occurred and a

more accurate number will need to be obtained from an expert based upon the original miles and date of sale. However, just like every other expert in the industry that had examined that vehicle, the CarMax appraisers had no problem detecting the paint work and because of that, the value of the vehicle dropped precipitously.

35. The value of that vehicle with all that paint work disclosed was approximately two-thirds of what Mr. Johnson had agreed to pay for it, based upon the assurances that the vehicle had no paintwork. That was an enormous difference and HBL knew that when it put that vehicle on the showroom floor for sale.

36. HBL knew everything about that vehicle when the original lessee brought it to HBL and dropped it off. HBL knew that the tires would not pass or qualify for Mercedes Pre-Owned Certification, but it falsely certified that to Mr. Johnson.

37. In the condition that HBL delivered the vehicle to Mr. Johnson, it was unsafe for operation on the roads of both Maryland and Virginia, but HBL certified to Mr. Johnson the exact opposite and allowed him to drive it off their lot in that unsafe condition. Not only did HBL know that those tires would not pass inspection, but it also knew about the extensive paint work that its affiliated repair shop did on the car.

38. HBL had a long history with this vehicle and clearly had developed a relationship with the initial owner/lessee. On July 1, 2016 when the car had only 7,085 miles on it, it was serviced at HBL for the first time and all subsequent service was performed there according to Carfax. At that service visit, HBL replaced all four tires, replaced the rear brake pads and performed an alignment.

39. On October 5, 2017 when the vehicle had 12,286 miles it was in HBL for tire condition and pressure check. Based upon information and belief, there is a repair order that reflects the fact

that the tires were already excessively worn or HBL told the owner/lessee that the tires were so close to being worn out that they needed to be replaced.

40. In light of the fact that the original tires required replacement at 7,000 miles, by 14,000 miles they would logically require replacement again.  On April 6, 2018 the vehicle was returned to HBL with 14,277 miles reported.  Evidence will likely demonstrate that HBL knew that these tires needed to be replaced to pass a Virginia Safety Inspection as well as the MB Certified pre-owned inspection/verification, and it fraudulently certified both.

41. Discovery will be necessary to determine why HBL decided to keep this vehicle and put it in its used car inventory, but it is reasonably believed that the original owner/lessee knows and struck a deal with HBL to purchase it so that he/she would not be responsible for the replacement of the tires and diminution in value due to the extensive and substandard body work.

## COUNT I
## (ACTUAL FRAUD RELATED TO THE S55)

42. Plaintiff incorporates by reference paragraphs one (1) through forty-one (41) as if fully set forth herein

43. HBL committed actual fraud in the first deal related to the 2004 S55, HBL falsely stated that the vehicle had no collision damage when Mr. Johnson asked about its history.

44. Mr. Johnson knows that the false statements concerning the condition of the vehicle at the time of sale were made by the salesperson and sales manager that he worked with on the sale, but at this point he does not recall their names.  Once he has an opportunity to examine the deal file documents from HBL, he will be able to conclusively identify the exact names of the individuals that he dealt with and that made the false and fraudulent statements to him related to the S55.

45. The representation and assurance that the vehicle had no collision damage or repair work was a material fact that directly impacted the value of the vehicle and whether or not he would be willing to purchase the vehicle.

46. The S55 vehicle had in fact been damaged and repaired and HBL knew it when it made the false statement. More importantly, HBL knew that the Carfax was inaccurately reporting no collision damage and used that inaccurate report to disguise the fraud and support the false statement that the vehicle had not been in a collision or had any repair work.

47. When Mr. Johnson brought the vehicle back to trade it in on the purchase of another vehicle, HBL identified the prior damage and explained that it had diminished the trade-in value of the vehicle by what amounted to more than seventy percent (70%).

48. The fact that HBL used the Carfax report to support its statement that the vehicle had never been in a collision was more evidence of the knowledge and attempt to falsely assure Mr. Johnson of the sound condition of the vehicle.

49. Mr. Johnson relied upon HBL as a reputable new and used Mercedes-Benz automobile dealer to provide him with accurate and reliable information about the vehicles that he was purchasing. He did in fact rely upon the false representation concerning the original vehicle and did not discover the fraud until he returned to HBL to trade the vehicle and the dealer notified him of the prior collision damage.

50. By that time the reporting had caught up with Carfax, both HBL and Carfax were acknowledging that this vehicle had been damaged and repaired before HBL purchased it and sold it to Mr. Johnson.

51. Had HBL disclosed the truth about the condition of the vehicle at the time of sale, Mr. Johnson would not have agreed to purchase the vehicle.

52. Mr. Johnson suffered actual damages as a result of the fraud equal to the diminution in value at the time that he purchased the S55 and at a bare minimum the difference in value between what it should have been worth and what HBL offered him in trade for the vehicle.

53. Conversely, HBL benefitted by the fraud by charging substantially more for the vehicle than it was worth.  Because he overpaid for the vehicle due to its true condition, Mr. Johnson also over paid for sales taxes and interest over the term of the loan.  At 13.24% A.P.R., Mr. Johnson was paying $462 in interest over the term of the loan for each $1,000 financed.  Thus, if the vehicle had been overpriced by $15,000, Mr. Johnson would have paid the additional sales taxes on the inflated amount as well as an additional $6,930 in interest over the term of the loan which he paid until completion.

54. Even after the original S55 had depreciated significantly, the difference in what the vehicle was worth versus what it should have been worth was enormous: $14,000 vs. $4,000.  Plaintiff will need the assistance of an expert to evaluate the difference in value of the S55 at the time of sale based upon the existence and condition of the repair work to the vehicle.

55. It is reasonably believed that the documents in HBL's possession will shed light on the difference in value and the additional profit that it made upon the sale of the vehicle by intentionally defrauding Mr. Johnson about the condition of the vehicle.

56. Plaintiff will also seek substantial punitive damages, interest payments on the fraudulent overpayment, costs and legal fees from HBL based upon its intentional fraud

## COUNT II
## (VCPA RELATED TO THE S55)

57. Plaintiff incorporates by reference paragraphs one (1) through fifty-six (56) as if fully set forth herein.

58. Defendant is a "supplier" as defined by Va. Code § 59.1-198, in that it is a seller who "advertises, solicits, or engages in consumer transactions."

59. The transaction involving the sale of the vehicle constitutes a "consumer transaction" as defined by Va. Code § 59.1-198.

60. Accordingly, the subject transaction is regulated by the VCPA as codified in Va. Code § 59.1-196 *et seq.*

61. Defendant violated Virginia Code §59.1-200A(14) which prohibits using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

62. Defendant violated Virginia Code §59.1-200A(5) which prohibits misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses or benefits.

63. HBL violated the VCPA at §59.1-200A(5) and §59.1-200A(14), in the first deal related to the 2004 S55, when HBL falsely stated that the vehicle had no collision damage when Mr. Johnson asked about its history.

64. The foregoing facts and misrepresentations also evidence a violation of the Virginia Consumer protection Act §59.1-200A(5) and (14) in that HBL misrepresented that the S55 vehicle had the qualities and characteristics of a vehicle that had not been damaged and repaired and using actual fraud and misrepresentation concerning the present condition of the vehicle in order to sell it as a vehicle that had not been involved in a collision and subsequently been repaired.

65. Based upon information and belief, HBL employees knew that the 2004 S55 had prior collision damage, and they used the Carfax report to conceal the collision damage to induce Plaintiff to purchase the vehicle and deceive him into purchasing the vehicle.

66. Mr. Johnson suffered a loss and actual damages as a result of HBL misrepresentations and deceptions about the vehicle including the diminished value of the vehicle, distress damages, frustration, upset.

67. HBL's actions were willful and reckless because it knew the prior condition of the vehicle and used the Carfax report to deceive Mr. Johnson as to the 2004 S55's history as alleged in the facts herein.

## COUNT III
## (ACTUAL FRAUD RELATED TO THE E63)

68. Plaintiff incorporates by reference paragraphs one (1) through sixty-seven (67) as if fully set forth herein

69. With regard to the second vehicle (E63 AMG) HBL repeated its fraudulent sales tactics by once again using a false and misleading Carfax report to conceal the prior collision and repair work to the vehicle.

70. Once again HBL knew that the vehicle had been damaged extensively on the driver's side because it was servicing the vehicle, the repairs were done by its affiliated body shop, HBL took the car back at the conclusion of the lease, and decided to purchase the vehicle from the original lessee Mercedes-Benz Finance.

71. It is reasonably suspected that this dealership made a deal with the original owner/lessee that it would purchase the vehicle and absorb the consequential costs and damages that he/she would have faced had he/she simply returned the vehicle to Mercedes Benz Finance.  Some or all of those costs would have been passed along to the original owner/lessee.

72. As part of that deal, the original owner/lessee in all likelihood purchased or leased a new vehicle from HBL.  In any event, HBL knew all about this vehicle when it decided to purchase it and put it in its used car inventory.

73. What is particularly disturbing and reprehensible is that HBL decided to target a victim that it had already defrauded and even assure Mr. Johnson that it was not doing the same thing to him again.  The degree of reprehensibility to defraud the same individual in the exact same manner all the time looking him in the face and assuring him that it was not repeating the same behavior, is simply staggering.

74. HBL falsely represented that there had been no damage to the E63 and no repair work, when it knew that its affiliated body shop had repaired and painted both driver's side doors.

75. HBL knew that this second round of fraud was highly material to Mr. Johnson because he had already been defrauded, and he wanted HBL's absolute assurance that it was not going to do that to him again and that this second vehicle was a clean car with no body/paint work.

76. HBL knew from the first vehicle that Mr. Johnson could not discover body and paint work to a vehicle and that he was totally reliant upon HBL's professional skills to examine the vehicle and assure him of no such damage.

77. In order to close the deal and charge Mr. Johnson top dollar for this vehicle, it knowingly, intentionally and with the express intent to defraud him assured him that this vehicle had no body work, paint work or collision repair damage.

78. Based upon those false statements, Mr. Johnson agreed to purchase the vehicle.  If HBL had disclosed the truth about the condition of the vehicle, Mr. Johnson never would have agreed to purchase it.

79. HBL knew that having already defrauded Mr. Johnson about the condition of the prior vehicle that if it had told him the truth about the condition of the E63, he never would have agreed to purchase the behicle. As a result, Mr. Johnson paid approximately twenty thousand dollars more for this vehicle than it was worth at the time of sale.

80. Once Mr. Johnson discovered the fraud, he brought it to the attention of the sales manager (Mr. Hoover) who tried to play dumb, claim that he could not see any paint work and then later claim that the damage was minimal and would not impact the value of the vehicle.  It was at this point that Mr. Hoover and HBL tried to use more fraud and deception to convince Mr. Johnson that the damage to the vehicle was not that extensive and had little to no impact on the value of the vehicle.

81. In an effort to try and convince Mr. Johnson that the damage had little to no impact on the resale value of the vehicle, he offered to give Mr. Johnson an additional $1,500 bonus if he decided to trade the vehicle back into HBL at a later date.

82. Mr. Hoover knew how significant the damage and substandard repair work was and how significantly it impacted the resale value of the vehicle, but he once again tried to deceive Mr. Johnson into retaining the vehicle and believing that the impact on the value was minimal.

83. Plaintiff will also seek substantial punitive damages, interest payments on the fraudulent overpayment, costs and legal fees from HBL based upon its intentional fraud.  Extensive documents and evidence will need to be recovered from the Respondent to support the claim that HBL knew about the damage, but also what diminution of value it placed on the vehicle based upon the substandard repair work to both driver's side doors.

## COUNT IV
## (VCPA RELATED TO THE E63)

84. Plaintiff incorporates by reference paragraphs one (1) through eighty-three (83) as if fully set forth herein.

85. Defendant is a "supplier" as defined by Va. Code § 59.1-198, in that it is a seller who "advertises, solicits, or engages in consumer transactions."

86. The transaction involving the sale of the vehicle related thereto constitutes a "consumer transaction" as defined by Va. Code § 59.1-198.

87. Accordingly, the subject transaction is regulated by the VCPA as codified in Va. Code § 59.1-196 *et seq.*

88. Defendant violated Virginia Code §59.1-200A(14) which prohibits using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

89. Defendant violated Virginia Code §59.1-200A(5) which prohibits misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses or benefits.

90. The fraud and misrepresentations identified in the factual averments also constituted violations of the Virginia Consumer Protection Act §59.1-200A(5) and (14) in that HBL misrepresented that the vehicle had the qualities and characteristics of a vehicle that had not been damaged and repaired and using actual fraud and misrepresentation concerning the present condition of the vehicle in order to sell it as a vehicle that had not been involved in a collision and subsequently been repaired.

91. With regard to the E63 AMG, the damages between what Mr. Johnson paid for the vehicle and its actual value at the time are anticipated to be in the minimum range of $20,000 based upon the evaluation by Carmax.

92. It is also anticipated that HBL will have additional documentation to disclose the profit it made on the vehicle and the cost that it passed along to the original owner/lessee.

93. In light of the fact that the repairs are substandard and were never even disclosed, and additional damage may be the cost to correct the repair work, which is believed to be in the neighborhood of $10,000.

94. In addition to the financial and monetary damages that Mr. Johnson suffered, he also suffered distress damages.  It was one thing to be subjected to fraud the first time, but to be victimized by the same dealership in successive frauds involving the substantial amounts of money that he overpaid, has adversely impacted Mr. Johnson.

95. Mr. Johnson still wonders why HBL chose him to be deceived on successive occasions. What was it about him that would give HBL the confidence that it could look him straight in the eye and do it to him again?  Why did HBL believe that he would be none the wiser, or if he did discover the fraud that he could be deceived into believing that the damage was not significant?

96. Mr. Johnson wonders and wants to know if his race had anything to do with the decision to defraud him and then try to bamboozle him after he uncovered the fraud.  No matter what the reason HBL selected him, it has caused Mr. Johnson significant distress and frustration at being victimized twice by the same entity.

97. The extent of the fraud and subsequent attempts to cover-up the fraud should expose what a troubled dealership this is and only the finding of a willful violation and treble damages will send HBL the message that this sort of brazen fraud to deceive people like Mr. Johnson just so it can make higher profits on the backs of individuals like him, will not be tolerated.

### **Prayer for Relief**

Wherefore, the plaintiff prays that the Court award the following relief:

a)  compensatory damages against Defendant;

b)  punitive damages against Defendant;

c)  enhanced statutory damages against Defendant based upon the willful violations of the VCPA;

d)  interest, pre-judgment interest, costs and reasonable attorneys' fees;

e)      all other further relief that this Court deems just and proper.

## Jury Demand

The Plaintiff demands a trial by jury on all issues.

Respectfully Submitted,
SHANON D. JOHNSON

By: Counsel

A. Hugo Blankingship, III. (VSB# 26424)
Thomas B. Christiano (VSB#43940)
BLANKINGSHIP & CHRISTIANO, P.C.
11790 Sunrise Valley Dt., Suite 103
Reston, Virginia 20191
Tel:  (571) 313-0412
Fax: (571) 313-0582
Email: hugo@blankingship.com